IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

IN THE MATTER OF THE SEARCH OF
THE CELLULAR TELEPHONE (865-330-
4968 – Target Device) IN CAYLEA
IREMONGER'S INMATE PROPERTY

Case No. 1:23-mj- 111

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Beaupain, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of an application for a warrant to search the following electronic device (Target Device), which is currently in the possession of the Hamilton County Sherriff's Office (HCSO), which is being held for the FBI to obtain this Search Warrant:

   a. The cellular telephone that was taken from Caylea IREMONGER when she was booked into the Hamilton County Jail and being held as part of her Jail Property. It is the only cellular telephone in her Jail property.

2. I am a Special Agent (SA) of the United States Department of Justice, Federal Bureau of Investigation (FBI), and have been so employed since November of 2005. I am currently assigned to the Knoxville Field Division at the Chattanooga Resident Agency of the FBI, and investigate cases involving violent gangs, drug trafficking, and violent fugitives. I have received training at the FBI Academy in Quantico, Virginia, including training on violent street gangs, criminal case management, informant development, Title III investigations and the identification, use, packaging, and sales of controlled substances. I have participated in numerous local and federal search warrants and arrests involving alleged narcotics trafficking, and I have

participated in numerous investigations of narcotics traffickers and violent street gangs. These investigations have involved the use of confidential informants, wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants.

3. I have interviewed numerous drug dealers, drug users, and knowledgeable confidential informants about the lifestyles, appearances, and habits of drug dealers and users. I have become familiar with the manner in which narcotics traffickers smuggle, package, transport, store and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, intentionally vague language, coded communications and slang-filled conversations, false and fictitious identities, and other means to facilitate their illegal activities and to thwart law enforcement investigations. I have had discussions with other law enforcement personnel about the packaging and preparation of narcotics, the distribution methods of illegal narcotics traffickers, and the security measures that narcotics traffickers often employ. I have also examined documentation of various methods by which methamphetamine, heroin, cocaine, cocaine base (crack), marijuana, and other illicit drugs are smuggled, transported, and distributed. I have participated in surveillance of narcotics traffickers. During these surveillances, I have personally observed narcotics transactions, counter-surveillance techniques, and the ways in which narcotics traffickers conduct clandestine meetings. I have also participated in investigations that involved the interception of wire communications, and I have been directly involved in the review and deciphering of intercepted coded conversations between narcotics traffickers that were later corroborated by surveillance or by defendants' statements.

4. I have received formal training at the FBI's Basic Agent Training in Quantico, Virginia. During this four-month course, I received several hundred hours of instruction in law enforcement investigations, including the identification, use, packaging, and sales of controlled

substances. I have also attended numerous training schools and seminars related to gang and narcotics investigations, including many that provided instruction on drug trafficking methods, money laundering methods, and techniques for investigating those crimes. Throughout my law enforcement career, and as part of my participation in this investigation, I have spoken with, worked with, and gained knowledge from numerous experienced federal, state, and local investigators.

5. The statements contained in this affidavit are based in part on recorded inmate telephone calls, information provided by FBI SAs, Chattanooga Police Department (CPD) officers, East Ridge Police Department (ERPD) officers, FBI Task Force Officers (TFO), and other law enforcement officers; my training and years of investigative experience; my consultation with other experienced agents and officers; and my personal participation in this investigation.

6. As a federal agent, I am authorized to investigate violations of the laws of the United States and am a law enforcement officer with authority to execute warrants issued under the authority of the United States.

7. Based on the information contained herein, there is probable cause to believe that the Target Device contains evidence, fruits, and instrumentalities of the crimes in violation with possession with intent to distribute controlled substances, namely methamphetamine, cocaine, and heroin, in violation of Title 21, United States Code (U.S.C.) § 841(a)(1), and that the Target Device was utilized in facilitating the distribution of Methamphetamine, Heroin, and Fentanyl; in violation of Title 21, United States Code, Section 843(b).

8. Because this affidavit is being submitted for the limited purpose of supporting the issuance of a Search Warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause for the issuance of a Search Warrant.

## PROBABLE CAUSE

9.      On or about October 20, 2021, IREMONGER showed affiant and FBI TFO Robert Wade, of the East Ridge Police Department (ERPD), content from her cellular telephone that showed previous illicit drug trafficking conversations with co-defendant CHARLES APPLEBERRY and identified him has her heroin supplier. This showed that IREMONGER did maintain prior drug trafficking evidence on cellular device.

10.     On or about May 26, 2022, Patrick CODY telephoned Caylea IREMONGER at telephone number 865-330-4968 (Target Device). Patrick CODY was upset with Caylea IREMONGER for allowing "junkies" to live with her and not selling enough drugs. Patrick CODY said, "You told me you gave someone a point of dope before they go to work and after they get to work every day?" Caylea IREMONGER responded, "(unintelligible) They pay me for that, asshole!" Patrick CODY criticized Caylea IREMONGER further for not making the people staying at her residence pay rent and pay for the heroin she supplied. Patrick CODY said, "If you have a house full of people that do dope, you should be serving all of them and making them pay rent." Caylea IREMONGER replied, "Ok."

11.     On or about August 13, 2022, Caylea IREMONGER was apprehended in Georgia by her Bonding Agent Denise EVANS after failing to appear in Hamilton County Court on numerous outstanding State drug violations. It is known through recorded inmate telephone calls that prior to IREMONGER's arrest, she was utilizing her cellular telephone (Target Device) to continue to commit drug trafficking crimes.

12.     Caylea IREMONGER is currently an inmate at the Silverdale Detention Facility, aka, Hamilton County Jail, located in, Chattanooga, Tennessee. Patrick CODY is currently an inmate at the Irwin County Detention Center in Ocilla, Georgia. Caylea IREMONGER maintains

communication with Patrick CODY by preplanned telephone calls to Patrick CODY's brother, Scott CODY, where he can three-way their telephone calls together.

13. According to EVANS during a recorded telephone conversation with Patrick CODY, Caylea IREMONGER had heroin on her person when EVANS apprehended her. A later recorded inmate telephone call between Caylea IREMONGER and Patrick CODY, Caylea IREMONGER admitted to Patrick CODY that she had a 1/8 oz of heroin on her person when EVANS caught her.

14. EVANS brought Caylea IREMONGER back to the Hamilton County Court and was booked into the Silverdale Detention Facility, aka, Hamilton County Jail, located at 7609 Standifer Gap Road, Chattanooga, Tennessee.

15. At the time, the FBI was unaware that Caylea IREMONGER's Jail property, including her cellular telephone, was being held by the Hamilton County Sherriff's Office (HCSO).

16. On September 27, 2022, the Grand Jury charged that from in or about January, 2021, until in or about September, 2022, in the Eastern District of Tennessee and elsewhere, the defendants, Patrick CODY; Caylea IREMONGER; Timothy BROWN; Robert COTHERN; Charles APPLEBERRY, also known as "C-Tre"; and other persons known and unknown to the Grand Jury, did combine, conspire, confederate and agree to knowingly, intentionally and without authority distribute and possess with intent to distribute fifty grams or more of methamphetamine (actual), a Schedule II controlled substance; Cocaine, a Schedule I controlled substance; Heroin, a schedule I controlled substance; and Fentanyl, a Schedule I controlled substance; in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and (b)(1)(C) and 846.

17. The Grand Jury further charged that on or about April 4, 2021, in the Eastern District of Tennessee, the defendants, Patrick CODY and Caylea IREMONGER, aided and abetted

by one another, knowingly and intentionally possessed with the intent to distribute five (5) grams or more of Methamphetamine (actual), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B) and Title 18, United States Code, Section 2.

18. The Grand Jury further charged that on or about October 20, 2021, in the Eastern District of Tennessee, the defendants, Charles APPLEBERRY, also known as "C-Tre," and Caylea IREMONGER, aided and abetted by one another, knowingly and intentionally attempted to possess with the intent to distribute Heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and Title 18, United States Code, Section 2.

19. The Grand Jury further charged that on or about November 23, 2021, in the Eastern District of Tennessee, the defendants, Caylea IREMONGER and Robert COTHERN, did knowingly and intentionally use a communication device, a telephone, in facilitating the commission of any acts constituting a felony under Title 21, United States Code, Sections 846 and 841(a)(1), that is, conspiracy to distribute and possess with intent to distribute Methamphetamine (actual), Heroin, and Fentanyl; in violation of Title 21, United States Code, Section 843(b).

20. On February 1, 2023, Tiffany TATE advised affiant and FBI TFO Wade that TATE had been present when Caylea IREMONGER was making drug sales, but did not see her directly exchanging drugs. IREMONGER would direct people to which room had the drugs. Specifically, in East Ridge TATE was with IREMONGER at Food City and IREMONGER would take the drug orders over her cellular telephone and she would direct people to where Patrick CODY was located to get the drugs.

21. On or about February 9, 2023, IREMONGER telephoned Maribeth IREMONGER at 732-259-7439. Maribeth IREMONGER asked, "Can you go online?" Caylea IREMONGER responded "No." Maribeth IREMONGER wanted to know why Caylea IREMONGER's online

Facebook profile showed she had been logged into her account. Caylea IREMONGER stated, "Because Squirrel (Robert COTHERN) is on my computer. It's logged into all my shit... Squirrel (COTHERN) has access to all my shit." Maribeth IREMONGER said, "I haven't heard from him... So."

22. Caylea IREMONGER said, "And Tim (Timothy BROWN) also has access. Tim's (BROWN's) iPad is connected to my Facebook. And, my computer is connected to my Facebook. So I will come on and off the whole time I'm locked up here. Because if they go my computer or they, he goes on his iPad it's gonna, it's gonna come up. I kept them logged into it so if I ever got locked out of my shit, I had a back way, a back door into my shit." Maribeth IREMONGER responded, "Oh ok, alright I was just asking, that's all. Cuz I see your name come up... That's all... You know, like that you're online, or you've been online." Caylea IREMONGER stated, "Yeah, It's Squirrel (COTHERN). Unless, unless, Squirrel (COTHERN) gave my computer to the Feds. And then they have everything. Maribeth IREMONGER responded, "Oh I don't know." Caylea IREMONGER continued, "And if he did that, then I'm in A-Lot more world of trouble than I think I am." Maribeth IREMONGER replied, "I don't know."

23. The fact that Caylea IREMONGER referenced COTHERN's computer and BROWN's iPad as a "Back door" into her accounts, is indicative that the Target Device is in fact her primary means of communication.

24. On or about March 9, 2023, Caylea IREMONGER telephoned Maribeth IREMONGER at 732-259-7439. Caylea IREMONGER talked about how Patrick CODY's lawyer had been to see him and said, "They just went to go pick up my drug dealer (APPLEBERRY)... Um... He did not show up for court... Um..."

25. On or about April 3, 2023, IREMONGER telephoned Maribeth IREMONGER at 732-259-7439. Caylea IREMONGER wanted Maribeth IREMONGER to come and pick up her

jail property, especially her cellular telephone (Target Device). Caylea IREMONGER advised that her previous Bondsman "Denise" (Denise EVANS) "She does shit on the side" and may get Caylea IREMONGER's property and mail it to Maribeth IREMONGER. Caylea IREMONGER said it was "Affordable Bonding in Chattanooga, Tennessee" and that "Denise" (EVANS) was the owner of the company. Caylea IREMONGER had an Eddie Bauer book-bag, worth $200, and $43 in cash she offered for "Denise" (EVANS) to keep if she mailed the cellular telephone (Target Device) to Maribeth IREMONGER. Caylea IREMONGER said "Everything" was on her cellular telephone (Target Device), including every picture all the way back to the birth of her child.

26. On or about April 5, 2023, Caylea IREMONGER was brought over from State custody for her Initial Appearance. Caylea IREMONGER was returned to the Hamilton County Jail to continue her custody.

27. On or about April 5, 2023, IREMONGER telephoned Patrick CODY's brother, Scott CODY, at telephone number 201-985-4421. Patrick CODY soon was linked into the telephone call. IREMONGER wanted Patrick CODY to get in contact with "Denise" (Denise EVANS) to see if she would pick up IREMONGER's property from the jail and mail it to her mother (Maribeth IREMONGER). Patrick CODY said he would try but did not think she would do it for IREMONGER. Patrick CODY provided IREMONGER with telephone number 865-207-8013 as point of contact for EVANS.

28. On or about April 9, 2023, Patrick CODY telephoned EVANS at telephone number 865-207-8013. Patrick CODY asked if EVANS could pick up Caylea IREMONGER's cellular telephone (Target Device) at the Hamilton County Jail. Patrick CODY asked if she could just mail the cellular telephone (Target Device) to her mother. The rest of Caylea IREMONGER's property could be thrown out. EVANS said she would but would be a few days before EVENS could get out to the jail.

29. On or about April 11, 2023, Caylea IREMONGER telephoned EVANS at telephone number 865-207-8013. Caylea IREMONGER wanted EVANS to go to the HCSO Jail and pick up her property. Caylea IREMONGER advised there was some cash with her other property that EVANS could keep. Caylea IREMONGER only wanted her cellular telephone (Target Device) and asked if EVANS could mail it to her mother, Maribeth IREMONGER. EVANS advised that she had already spoken to Patrick CODY, and agreed to go pick up Caylea IREMONGER's property.

30. On or about April 13, 2023, FBI TFO Robert Wade contacted the HCSO to secure the cellular telephone (Target Device) in Caylea IREMONGER's Jail Property.

31. Based on this statements above, and others, IREMONGER's computer was linked to all of her social media accounts, to which her co-conspirators, COTHERN and BROWN, all had access. IREMONGER believed that COTHERN and BROWN were cooperating against Caylea IREMONGER and likely gave her computer to the United States. In this regard, Caylea IREMONGER believes the United States already has from her computer the criminal activities from her social media platforms. However, Caylea IREMONGER also utilized the Target Device to not only link to her social media accounts, but also has features specific to a cellular device (Target Device) outside of the social media features.

32. I believe Caylea IREMONGER legitimately wants the Target Device because she is logged into all of her social media accounts, to which she has no accessibility outside of the accounts she is already logged into, and to the information in the Target Device's electronic storage data.

33. I believe probable cause exists that the Target Device contains evidence, fruits, and instrumentalities of the crimes listed above for not only Caylea IREMONGER, but also of her co-conspirators charged in the same indictment.

## FACTS ABOUT CELLULAR PHONES

34. Based on my training and experience and the training and experience of law enforcement personnel who routinely handle this type of equipment, I understand that the Target Device has been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the law enforcement's possession.

35. Based on my training, experience, and information provided to me by other law enforcement personnel, I am aware that individuals carry out, communicate about, and store records regarding their daily activities on equipment like the Target Device. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, text messages, and other forms of phone or internet-based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information on the internet; accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

36. Based on my training, experience, and information provided to me by other law enforcement personnel, I am aware that individuals involved in the planning and execution of drug distribution communicate with each other through the use of cellular telephones like the Target Device. Additionally, I am also aware that individuals involved in the planning and execution of drug distribution communicate using social media networking sites like Facebook, Snapchat, WhatsApp, etc. which can be accessed through cellular telephones like the Target Device.

37. I also know that many smartphones like the Target Device (which are included in Attachment B's definition of "computer hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, banking, use money transfer applications

to receive and send money, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Based on my training, experience, and information provided to me by other law enforcement personnel, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

38. Through my training and experience, I know that oftentimes individuals engaged in criminal activity will discard and/or replace old phones in an attempt to evade detection by law enforcement or to prevent law enforcement from seizing digital evidence from a particular device. However, although an actual device may be switched by a suspect, information contained in and/or associated with the previous device can be transferred to the new device. This transfer of information usually occurs, amongst other reasons, because individuals can continue to use the same Apple ID / Android ID (accounts designed to store a user's information) when switching between physical devices.

39. Based on my training, experience, and information provided to me by other law enforcement personnel, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person

"deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## AUTHORIZATION REQUEST

35. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

36. I further request that the Court authorize execution of the warrant at any time of day or night. Owing to the fact the Target Device is already in the possession of law enforcement, the time of service does not affect the user or subscriber of the Target Device.

Respectfully submitted,

Matthew S. Beaupain
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 20th day of April 2023.

By: Christopher H. Steger
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone being held by the Hamilton County Sheriff's Office, at the Hamilton County Jail, as part of the property of Inmate Caylea IREMONGER.

# ATTACHMENT B

## Description of Particular Things to be Seized

1. All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. § 924(j) and 18 U.S.C. § 1951, including those related to:

   A. Evidence of who used, owned, or controlled the equipment;

   B. The identities, aliases, contact telephone numbers, identifying contact information of individuals whom participated in the possession and the possession with the intent to distribute controlled substances;

   C. The locations where planning and/or actual possession with the intent to distribute occurred;

   D. The communications where evidence or other items related to drug possession, distribution, and related crimes occurred;

   E. The methods of communication between participants of the possession with the intent to distribute, including the telephone numbers, messaging applications, and social media accounts used by the individuals;

   F. The substance of communications regarding the planning, execution, and/or discussion of possession with the intent to distribute;

   G. The substance of communications regarding the acquisition, disposal, and/or discussion of firearms, and other items intended to be used before, during, or after the commission of drug trafficking crimes;

   H. The substance of communications regarding firearms and/or ammunition;

   I. The substance of communications regarding money or other items acquired during the possession with the intent to distribute;

   J. Photographs of items or information related to the planning, execution, or discussions related to possession with the intent to distribute;

   K. The relationship between the user of the Target Device and other identified, and unidentified, co-conspirators;

   L. The identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

M. Evidence of malicious computer software that would allow others to control the equipment, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

N. Evidence of the attachment of other hardware or storage media;

O. Evidence of counter-forensic programs and associated data that are designed to eliminate data;

P. Evidence of the times the equipment was used;

Q. Passwords, encryption keys, and other access devices that may be necessary to access the equipment;

R. Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media;

S. Records relating to the ownership, occupancy, or use of the location from which the equipment was obtained by law enforcement investigators;

T. Records relating to the ownership, occupancy, or use of locations from which controlled substances are being stored, packaged, and sold;

U. Any information discussing quantities, prices, pay owe records, and terminology used in the commission of possession with the intent to distribute controlled substances; and

V. Communications between sources of supply of controlled substances and the relationship with the supplier and the user of the Target Device.

W. Serial numbers, telephone number, and any electronic identifiers that serve to identify the equipment further.

## DEFINITIONS

For the purpose of this warrant:

X. "Equipment" means any hardware, software, storage media, and data.

Y. "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for

removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

Z. "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

AA. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

BB. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

CC. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.